FILED

2014 May-21  AM 11:45
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| BARBARA WADSWORTH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. |
| | ) | 2:12-CV-1805-AKK |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of Social | ) | |
| Security, | ) | |
| | ) | |
| Defendant. | ) | |

## **MEMORANDUM OPINION**

The plaintiff, Barbara Wadsworth, brings this action pursuant to the provisions of 42 U.S.C. § 405(g), seeking judicial review of a final adverse decision of the Commissioner of the Social Security Administration denying her applications for disability insurance benefits and Supplemental Security Income. Wadsworth timely pursued and exhausted her administrative remedies available before the Commissioner.  Accordingly, this case is now ripe for judicial review under 42 U.S.C. § 405(g).  Based on the court's review of the record and the briefs submitted by the parties, the court finds that the decision of the Commissioner is due to be affirmed.

# I.  STANDARD OF REVIEW

The sole function of this court is to determine whether the decision of the Commissioner is supported by substantial evidence and whether the ALJ applied the proper legal standards.  *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983).  To that end this court "must scrutinize the record as a whole to determine if the decision reached is reasonable and supported by substantial evidence."  *Id.*  (citations omitted).  Substantial evidence is "such relevant evidence as a reasonable person would accept as adequate to support a conclusion."  *Id.*  This court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner.  *Id.*  Even if the court finds that the evidence preponderates against the Commissioner's decision, the court must affirm if the decision is supported by substantial evidence.  *Id.*

Unlike the deferential review standard applied to the Commissioner's factual findings, "no similar presumption of validity attaches to the [Commissioner's] conclusions of law, including determination of the proper standards to be applied in reviewing claims."  *Wiggins v. Schweiker*, 679 F.2d 1387, 1389 (11th Cir. 1982) (quoting *Smith v. Schweiker*, 646 F.2d. 1075, 1076 (5th Cir. Unit A Jun.1981)).  Therefore, this court reviews de novo the Commissioner's conclusions of law.  *Ingram v. Comm'r of Soc. Sec.*, 496 F.3d

1253, 1260 (11th Cir. 2007).  The Commissioner's "failure to apply the correct law or to provide the reviewing court with sufficient reasoning for determining that the proper legal analysis has been conducted mandates reversal."  *Cornelius v. Sullivan*, 936 F.2d 1143, 1145-46 (11th Cir.1991).

## II.  STATUTORY AND REGULATORY FRAMEWORK

To qualify for disability benefits, a claimant must be unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  A "physical or mental impairment" is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D).

Social Security regulations outline a five-step process that the Commissioner uses to determine whether a claimant is disabled.  20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 416.920(a)(4)(i)-(v).  The Commissioner must determine in sequence:

    (1)    whether the claimant is currently engaged in substantial gainful activity;

(2)     whether the claimant has a severe impairment or combination of impairments;

(3)     whether the claimant's impairment meets or equals the severity of an impairment in the Listing of Impairments;[1]

(4)     whether the claimant can perform any of his or her past work; and

(5)     whether there are significant numbers of jobs in the national economy that the claimant can perform.

*Winschel v. Comm'r of Soc. Sec*, 631 F.3d 1176, 1178 (11th Cir. 2011).  The evaluation process continues until the Commissioner can determine whether the claimant is disabled.  20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).  A claimant who is doing substantial gainful activity will be found not disabled at step one.  20 C.F.R. §§ 404.1520 (a)(i), 416.920(a)(4)(i).  A claimant who does not have a severe impairment will be found not disabled at step two.  20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii).  A claimant with an impairment that meets or equals one in the Listing of Impairments will be found disabled at step three.  20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii).

Prior to considering steps four and five, the Commissioner must assess the claimant's residual functional capacity (RFC), which will be used to determine the

---

[1]  The Listing of Impairments ("Listings"), found at 20 C.F.R. Part 404, Subpart P, Appendix 1, are used to make determinations of disability based upon the presence of impairments that are considered severe enough to prevent a person from doing any gainful activity.  20 C.F.R. § 404.1525.

claimant's ability to work.  20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).  A

claimant who can perform past relevant work will be found not disabled at step

four.  20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).  At step five the burden

shifts to the Commissioner to show other work the claimant can do.  *Foot v.*

*Chater*, 67 F.3d 1553, 1559 (11th Cir. 1995).  To satisfy this burden the

Commissioner must produce evidence of work in the national economy that the

claimant can do based on the claimant's RFC, age, education, and work

experience.  20 C.F.R. §§ 404.1512(f), 416.912(f).  A claimant who can do other

work will be found not disabled at step five.  20 C.F.R. §§ 404.1520(a)(4)(v),

416.920 (a)(4)(v).  A claimant who cannot do other work will be found disabled.

*Id.*

　　　In the present case, the Administrative Law Judge (ALJ) determined

Wadsworth was not engaged in substantial gainful activity, and found she had the

severe impairments of "mood disorder, social phobia, and post traumatic stress

disorder."  R. 18.  He concluded Wadsworth did not suffer from a listed

impairment.  R. 20.  He found Wadsworth had the RFC to perform "a full range of

work at all exertional levels."  R. 22.  However, he added the following

nonexertional limitations:

　　　　　She can perform simple and repetitive, but not complex tasks.  She
　　　　　can maintain attention and concentration for two hours at a time to

complete a 40 hour workweek provided all customary breaks were
given. She should have no contact with the general-public, and
contact with co-workers and supervisors should be casual. She needs
a well spaced workplace with very limited contact with co-workers.
She may need flexibility in scheduling that would remain within
competitive limits. Supervision should be direct and non-
confrontational. She would miss work one day per month due to
psychological symptoms.

R. 22. With this RFC, the ALJ found Wadsworth unable to perform her past

relevant work. R. 24.

When a claimant is not able to perform the full range of work at a particular

exertional level, the Commissioner may not exclusively rely on the Medical-

Vocational Guidelines ("the grids") to establish the presence of other jobs at step

five.[2] *Foote*, 67 F.3d at 1558-59. The presence of a non-exertional impairment

(such as pain, fatigue, or mental illness) also prevents exclusive reliance on the

grids. *Id.* at 1559. In such cases "the [Commissioner] must seek expert vocational

testimony." *Id*. Based on Wadsworth's RFC and the testimony of a vocational

expert (VE), the ALJ found Wadsworth could perform other work in the national

---

[2] The Medical-Vocational Guidelines, found at 20 C.F.R. Part 404, Subpart P, Appendix
2, are used to make determinations of disability based upon vocational factors and the claimant's
residual functional capacity when the claimant is unable to perform his vocationally relevant past
work. 20 C.F.R. Part 404, Subpart P, Appendix 2, § 200.00(a). Such determinations, however,
are only conclusive when all of the criteria of a particular rule are met. 20 C.F.R. Part 404,
Subpart P, Appendix 2, § 200.00(a).

economy.  R. 24-25, 54-55.  Therefore, he found she was not disabled at step five

of the sequential evaluation framework.  R. 25.

## III.  FACTUAL BACKGROUND

Wadsworth filed her current applications for a period of disability, disability

insurance benefits, and Supplemental Security Income (SSI) on March 10, 2008,

and alleges she became disabled on April 1, 2002.[3]  R. 16.  Wadsworth was 43

years old at the time of the ALJ's decision.  R. 24-25.  She has a high school

education, and past relevant work as a bench assembler, teacher's aide,

cashier/checker, transporter of patients, cafeteria attendant, and store laborer.  R.

24.  She alleges she is disabled due to back and shoulder pain, carpal tunnel

syndrome, depression, post traumatic stress disorder, and diabetes.  Pl.'s Br. 2.

The treatment records show Wadsworth was treated on a regular basis at

Birmingham Health Care for diabetes, hypertension, back pain, shoulder pain,

carpal tunnel syndrome, and a variety of other intermittent conditions.  (Exhibits

---

[3]  Wadsworth filed three prior claims for disability insurance and SSI, the most
recent of which she filed on May 4, 2007.  R. 44.  Those claims were denied on August
1, 2007, and July 26, 2007, respectively.  R. 16, 151.  At the hearing, Wadsworth's
attorney requested that those claims be reopened.  R. 45.  The ALJ did not discuss
whether he was reopening those claims in his decision, but Wadsworth argues that the
claim was de facto reopened because the ALJ considered evidence from the prior claim.
Because the court concludes the ALJ's determination that Wadsworth was not disabled
from April 1, 2002, through the date of his decision is supported by substantial evidence,
it is not necessary to determine whether the prior claim was reopened.

5F, 9F, 11F, 12F , 15F.)   These records show Wadsworth's diabetes was generally well controlled.  They also show Wadsworth's complaints and treatment for back and shoulder pain were sporadic, and at times followed strenuous activities or injuries.  For example, on June 5, 2008, Wadsworth reported that her back pain flared when she cut the grass or trimmed the hedges.  R. 223.  Also, on June 19, 2008, Wadsworth reported that she experienced back pain when she exercised at Riviera Fitness.  R. 219.  Similarly, on December 2, 2009, Wadsworth reported shoulder pain following a fall.  R. 524.

On other visits she reported only mild shoulder pain, or that her shoulder pain had improved.  For example, on February 13,  2007, Wadsworth was treated for rotator cuff tendinitis, but rated her pain as only a three on a scale of one to ten.  R. 366.  Wadsworth also reported that her shoulder pain was "much better," and her pain assessment was zero on March 5, 2009.  R. 517.  She frequently reported that her pain level was zero.  *Eg*. R. 355, 357, 359, 516, 517, 524.

Wadsworth received treatment for her depression and post traumatic stress disorder (PTSD) at Capitol Care South.  When she initiated treatment on December 11, 2007, her psychiatrist diagnosed depression, with psychiatric features, and PTSD, assessed a GAF score of 65, and prescribed antidepressant medications.  R. 341.  When Wadsworth returned on January 11, 2008, she

8

reported mild improvement in her irritability and sadness, and her medications were increased.  R. 338. A month later, Wadsworth reported ongoing anger problems triggered by family conflict.  R. 337.  Her mood was noted to be good, and her medications were adjusted.  R. 337.  On March 7, 2008, Wadsworth reported improvement in her ability to finish tasks.  R. 336.  Her diagnosis of depression was changed to dysthemia, and it was noted that her PTSD was in remission.  R. 336.  On April 4, 2008, Wadsworth reported that her mood had been stable, and she denied symptoms of Major Depressive Disorder.  R. 335.  The record contains no other entries from Capitol Care South for 2008.

The only entry in 2009 is from April 30, 2009, during which Wadsworth's intake information was updated.  Wadsworth's diagnosis was now Mood Disorder, not otherwise specified, PTSD, and Social Phobia.  R. 549. As for 2010, on January 15, 2010, Wadsworth had a psychiatric follow-up visit with Dr. David Faber, her treating psychiatrist.  R. 552-54.  He noted the arrest of one of Wadsworth's daughters and that Wadsworth reported she was housebound, except for picking up another daughter at school, which represented a small improvement in her condition.  R. 552-53.  During that same visit, Dr. Faber completed a Supplemental Questionnaire, indicating Wadsworth had "marked" restrictions in six areas: activities of daily living; maintaining social functioning; responding to

customary work pressures; understanding and remembering instructions in a work setting; responding appropriately to supervision; and responding appropriately to co-workers.  R. 539-40.  Dr. Faber indicated there was no psychological evaluation in his records.  R. 540.  He wrote that Wadsworth was "[c]hronically impaired," and that "[g]ains made are relative to her dysfunctional baseline."  R. 540 (emphasis in original).

In addition to the treatment records, Wadsworth underwent two consultative physical examinations.  On June 30, 2007, Dr. Jian Fong conducted a consultative examination at the request of the Social Security Administration.  R. 591-94.  Dr. Fong noted Wadsworth had no difficulty walking, getting on and off the examination table, or taking off her shoes and socks.  R. 592.  On examination, Dr. Fong found Wadsworth had "positive lumbar spine tenderness with positive paravertebral muscle spasms" and "positive Tinel's and Phalen's signs of her wrists."  R. 593.

Dr. Bruce Romeo examined Wadsworth on July 17, 2008, and found no "deformity, tenderness, synovitis, or effusion" on physical examination of Wadsworth's extremities.  R. 238.  Dr. Romeo also found Wadsworth's shoulder range of motion and range of motion in her back were normal.  R. 240.  He found no spasm or deformity in his examination of Wadsworth's back.  R. 238.

There is also a consultative psychological evaluation performed by Dr. Sally

Gordon on July 3, 2007.  R. 596-99.  As a result of her evaluation, Dr. Gordon

opined Wadsworth

> should be able to learn, remember, and follow through on work
> instructions, although she may require extra time to consistently
> remember her work assignments. Her medical and psychological
> issues are likely to interfere with work performance at times,
> however. Thus, she may not be able to manage complex jobs that
> require good attention, sustained concentration, and executive skills,
> but she would likely be capable of working in jobs with simple work
> instructions and fairly routine tasks that do not involve extensive
> physical demands. She is likely to have moderate difficulty
> interacting with her coworkers, and at times she is likely to display
> poor control of her emotions. She should be able to accept
> supervision appropriately at most times but occasionally she may be
> contentious. She is likely to feel easily overwhelmed by any level of
> work pressure and very uncomfortable with social interactions at this
> time. However, she is not currently taking an antidepressant
> medication, which would likely be effective in resolving symptoms of
> depression and anxiety, and result in improved emotional resilience.

R. 599.

## IV.  DISCUSSION

Wadsworth raises the following issues on appeal: 1) whether the ALJ erred

in his consideration of the opinions of treating and examining physicians; 2)

whether the ALJ erred in finding she had no physical limitations; and 3) whether

the ALJ failed to properly consider her obesity.  The court addresses these

contentions separately below.

11

A.  **Alleged Error in Evaluation of Medical Evidence**

Wadsworth argues the ALJ erred in giving no weight to the opinion of her treating psychiatrist, Dr. Faber.  Pl.'s Br. 6-7.  She also argues Dr. Faber's opinions are consistent with those of Dr. Gordon, the Social Security Administration's consultative psychological examiner.  *Id.*  Wadsworth argues the ALJ did not give proper weight to these opinions in assessing her mental impairments.

As stated previously, Dr. Faber completed a Supplemental Questionnaire in which he indicated Wadsworth had "marked" restrictions in six areas: activities of daily living; maintaining social functioning; responding to customary work pressures; understanding and remembering instructions in a work setting; responding appropriately to supervision; and responding appropriately to co-workers.  R. 539-40.  Dr. Faber indicated there was no psychological evaluation in his records, that Wadsworth was "[c]hronically impaired," and that "[g]ains made are <u>relative</u> to her dysfunctional baseline."  R. 540 (emphasis in original).

Three years prior to Dr. Faber's Questionnaire, Dr. Gordon assessed Wadsworth with a GAF score of 45.[4]  R. 599.  She also opined Wadsworth would

---

[4]  The Global Assessment of Functioning (GAF) Scale is used to report an individual's overall level of functioning.  *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th Edition, Text Revision) ("*DSM-IV-TR*").  A GAF of 41-50 indicates:  "**Serious symptoms** (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) **or any serious impairment in**

be "likely to feel easily overwhelmed by any level of work pressure and very uncomfortable with social interactions at this time." R. 599. This opinion, coupled with Dr. Faber's, forms the basis for Wadsworth's contention of error.

In determining how much weight to give to each medical opinion, the ALJ must consider several factors, including (1) whether the doctor has examined the claimant; (2) whether the doctor has a treating relationship with the claimant; (3) the extent to which the doctor presents medical evidence and explanation supporting his opinion; (4) whether the doctor's opinion is consistent with the record as a whole; and (5) whether the doctor is a specialist. 20 C.F.R. §§ 404.1527(c), 416.927(c). Under the Commissioner's regulations, a treating physician's opinion will receive controlling weight if it is well supported and not inconsistent with other substantial evidence in the record:

> If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.

20 C.F.R. § 404.1527(c)(2).

"The law of this circuit is clear that the testimony of a treating physician must be given substantial or considerable weight unless 'good cause' is shown to

---

**social, occupational, or school functioning** (e.g., no friends, unable to keep a job)." *DSM-IV-TR* at 34 (emphasis in original).

the contrary." *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997). "Good cause" exists when the evidence does not bolster the treating physician's opinion; a contrary finding is supported by the evidence; or the opinion is conclusory or inconsistent with the treating physician's own medical records. *Id*. If a treating physician's opinion is rejected, "[t]he ALJ must clearly articulate the reasons for giving less weight to the opinion of a treating physician, and the failure to do so is reversible error." *Id.*

In the present case, the ALJ explained that he gave Dr. Faber's Supplemental Questionnaire no weight because it "is inconsistent with [Dr. Faber's] own treatment records." R. 23. In finding Wadsworth's mental impairments result in no greater than moderate difficulties, the ALJ noted that treatment notes from Dr. Faber showed a GAF score of 65 on December 11, 2007.[5] R. 23. He noted that her GAF had reached 82 on April 30, 2009.[6] R. 23. The ALJ further observed that after beginning mental health treatment, the lowest GAF score Wadsworth received was a 58 on January 15, 2010, "which was attributed to

---

[5] A GAF of 61-70 indicates: "**Some mild symptoms** (e.g., depressed mood and mild insomnia), **OR some difficulty in social, occupational, or school functioning** (e.g., occasional truancy, or theft within the household), **but generally functioning pretty well, with some meaningful interpersonal relationships**." *DSM-IV* at 32 (emphasis in original).

[6] A GAF of 81-90 reflects: "**Absent or minimal symptoms** (e.g., mild anxiety before an exam), **good functioning in all areas, interested and involved in a wide range of activities. socially effective, generally satisfied with life, no more than everyday problems or concerns** (e.g. an occasional argument with family members). DSM-IV-TR at 34 (emphasis in original).

14

a resent change in [her] situation."[7]   R. 23.  He concluded that these GAF scores

represented "moderate symptoms, which is consistent with the record as a whole."

R. 23.

The GAF scores discussed by the ALJ provide substantial evidence to

support his decision not to credit Dr. Faber's Supplemental Questionnaire.  They

show that Dr. Faber assessed a GAF score of 58, indicating moderate symptoms,

on the same day that he completed the Supplemental Questionnaire.  Therefore,

the ALJ had good cause for rejecting Dr. Faber's Supplemental Questionnaire

because it was not supported by Dr. Faber's own treatment notes.  *See Lewis*, 125

F.3d at 1440.

Likewise, the ALJ gave reasons for not crediting Dr. Gordon's GAF

assessment, i.e. after Wadsworth received treatment, "her condition drastically

improved."  R. 23.  The ALJ also relied on the GAF scores to support that

conclusion.  Significantly, even  Dr. Gordon qualified her opinions by observing

that Wadsworth "is not currently taking an antidepressant medication, which

would likely be effective in resolving symptoms of depression and anxiety, and

result in improved emotional resilience."  R. 599.  In fact, Dr. Faber's treatment

---

[7]  A GAF of 51-60 reflects: "**Moderate symptoms** (e.g., flat affect and circumstantial speech, occasional panic attacks) **OR moderate difficulty in social, occupational, or school functioning** (e.g., few friends, conflicts with peers or co-workers.)"  DSM-IV-TR at 34 (emphasis in original).

notes show Wadsworth's symptoms and GAF scores improved with treatment, and provide support for the ALJ's decision not to credit those portions of Dr. Gordon's report that indicate more than moderated mental symptoms.

In short, the ALJ articulated reasons supported by substantial evidence to support his decision to give Dr. Faber's Supplemental Questionnaire no weight, and also for his decision to reject portions of Dr. Gordon's report.  Therefore, the ALJ had good cause for rejecting those opinions and committed no reversible error.

## B.  Alleged Errors in Physical Limitations Findings

Wadsworth argues next that the ALJ's failure to include physical limitations in his RFC finding "does not comport with the evidence."  Pl.'s Br. 8.  She argues the ALJ "overly relied on consultative opinions" in making that finding and "erred in making no physical findings in light of [Wadsworth's] history of upper extremity impairments."  *Id.* at 8-9.

The medical records show Wadsworth complained of intermittent shoulder pain to her treating physicians.  Eg. R. 330, 528, 533, 535, 589.  However, the ALJ noted that Dr. Romeo, the Social Security Administration's consultative examiner, found no "deformity, tenderness, synovitis, or effusion" on physical examination of Wadsworth's extremities.  R. 19, 238.  The ALJ also observed Dr. Romeo found

Wadsworth's shoulder range of motion was normal.  R. 19, 240.  For these reasons, the ALJ concluded Wadsworth's shoulder impairment "has not resulted in a significant limitation that persisted for twelve months."  R. 19.

The treatment records also provide substantial evidence to support the ALJ's conclusion.  Those records show Wadsworth frequently reported that her pain level was zero.  Eg. R. 355, 357, 359, 516, 517, 524.  On other visits she reported only mild shoulder pain, or that her shoulder pain had improved.  For example, on February 13,  2007, Wadsworth was treated for rotator cuff tendinitis, but rated her pain as only a three on a scale of one to ten.  R. 366.  Wadsworth also reported that her shoulder pain was "much better," and her pain assessment was zero on March 5, 2009.  R. 517.

Although Wadsworth may disagree with the ALJ's factual findings, this court may not reweigh the evidence.  The ALJ's finding that Wadsworth's shoulder impairment did not cause significant limitations is reasonable in light of the treatment records and the consultative examination report of Dr. Romeo.  Therefore, substantial evidence supports that decision.

The other upper extremity impairment alleged by Wadsworth is carpal tunnel syndrome (CTS).  The ALJ found Wadsworth's CTS caused "no significant persistent limitation," and, therefore, found it was not a severe impairment.  R. 19.

17

In reaching that conclusion, the ALJ observed that although Dr. Mansuetta diagnosed bilateral CTS, he also found Wadsworth had a full active range of motion of both wrists and hands.  R. 19, 330.  The ALJ also relied on the consultative examination of Dr. Fong, who found a normal range of motion in Wadsworth's wrists, fingers, and thumb joints.  R. 19, 593.  The ALJ concluded that "the available evidence indicates that the claimant continues to have full use of her wrists and hands with no significant persistent limitation."  R. 19.  Therefore, he found Wadsworth's CTS was not a severe impairment.  Wadsworth has pointed to no evidence showing her CTS causes persistent significant limitations.  The ALJ's finding is reasonable based on the medical evidence of record, and, therefore, is supported by substantial evidence.

## C.  **Alleged Failure to Consider Obesity**

Finally, Wadsworth cites Social Security Ruling 02-1p, and suggests the ALJ did not consider whether her obesity exacerbated her physical and mental conditions.  Pl.'s Br. 8.  She also argues the ALJ erred in failing to find physical limitations in light of her obesity.  *Id.* at 9.[8] The court disagrees.

---

[8]  Although the ALJ found Wadsworth had no physical limitations, the court notes that even if Wadsworth were limited to sedentary work, the vocational expert testified she would be able to perform other jobs existing in the national and regional economy.  R. 55.

Social Security Ruling (SSR) 02-01p provides guidance in the evaluation of obesity. It provides that "[t]here is no specific level of weight or BMI that equates with a 'severe' or 'not severe' impairment," and that "descriptive terms for levels of obesity (e.g., 'severe,' 'extreme,' or 'morbid' obesity)" will not establish whether obesity is a "severe" impairment. SSR 02-1p, 2002 WL 34686281, *4 (S.S.A.). Rather, an ALJ must "do an individualized assessment of the impact of obesity on an individual's functioning," and must assess "the effect obesity has upon the individual's ability to perform routine movement and necessary physical activity within the work environment," *id.* at * 6.

In discussing Wadsworth's treatment for back pain and her diagnosis of obesity, the ALJ observed that Dr. Fong found Wadsworth had no difficulty walking or getting on and off the examining table. R. 19, 591-594. He also cited the report of Dr. Romero, which showed Wadsworth had a full range of motion in all areas and could stoop, kneel, crouch, tandem walk, and walk on heels and toes. R. 19, 236-245. Therefore, in accordance with SSR 02-1p, the ALJ considered Wadsworth's "ability to perform routine movement and necessary physical activity within the work environment" in assessing the vocational impact of her obesity.

Significantly, Wadsworth cites to no medical evidence showing that her obesity caused physical or mental limitations. The regulations provide that it is

the claimant's responsibility to provide evidence showing the presence of an

impairment and how it affects her functioning:

> You must provide medical evidence showing that you have an
> impairment(s) and how severe it is during the time you say that you
> are disabled.  You must provide evidence . . . showing how your
> impairment(s) affects your functioning during the time you say that
> you are disabled . . . .

20 C.F.R. § 416.912(c).  In *Ellison v. Barnhart*, the court emphasized that "the

claimant bears the burden of proving that he is disabled, and, consequently, he is

responsible for producing evidence in support of his claim."  355 F.3d 1272, 1276

(11th Cir. 2003) (citing 20 C.F.R. § 416.912(a), (c)).  Put simply, Wadsworth has

failed to meet her burden to provide evidence showing her obesity causes

limitations in her physical or mental functioning.

In short, contrary to Wadsworth's contention, the ALJ discussed

Wadsworth's obesity in his decision and found that it did not result in significant

restrictions.  He also properly considered her obesity in accordance with SSR 02-

01p.  His conclusion that Wadsworth's obesity did not cause physical limitations

is reasonable based on the evidence in the record.  Therefore, this finding is

supported by substantial evidence.

## V.  CONCLUSION

The court concludes the ALJ's determination that Wadsworth is not disabled is supported by substantial evidence, and that the ALJ applied the proper legal standards in arriving at this decision.  Accordingly, the Commissioner's final decision is due to be affirmed.  An appropriate order will be entered.

DONE this 20th day of May, 2014.

**ABDUL K. KALLON**
UNITED STATES DISTRICT JUDGE